**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| BE STRONG LLC d/b/a BORDERLAND CHEVROLET GMC, BASEMENT LLC, MARK MERMIS and KEVIN WALTERS,<br><br>Plaintiffs,<br><br>v.<br><br>GENERAL MOTORS LLC, and AMERICREDIT FINANCIAL SERVICES INC. d/b/a GM FINANCIAL,<br><br>Defendants. | Case No. __________<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT**

Plaintiffs, Be Strong LLC d/b/a Borderland Chevrolet GMC ("Borderland"), Basement LLC, Mark Mermis and Kevin Walters (collectively, "Plaintiffs"), by its attorneys, Bellavia Cohen, P.C., complaining of Defendants, General Motors LLC ("GM") and AmeriCredit Financial Services Inc. d/b/a GM Financial GMC ("GMF") (collectively, "Defendants"), allege as follows:

**NATURE OF THE ACTION**

1. This is an action brought by Plaintiff Borderland, a former minority- and veteran-owned GMC automobile dealership, and its principals, against Defendants GM and GMF, to recover $20 million in damages for its fraud, other wrongful acts, violations of federal and state law which protect automobile dealers,[1] and racial discrimination in violation of § 42 U.S.C. 1981. In short, Defendants induced Plaintiffs to purchase a GM-franchised dealership in Douglas,

[1] Namely. the Federal Automobile Dealer's Day in Court Act, codified as 15 U.S.C. §§ 1221 to 1226 (the "Federal Act"), and the Arizona Franchised Motor Vehicle Dealer Act, codified at Arizona Revised Statutes §§ 28-4451 to 28-4464, (the "State Act").

Arizona, which they knew was an economically distressed and troubled location, representing that Plaintiffs would be approved for relocation to a more economically viable site after the purchase. Instead, Defendant GM unjustifiably refused to approve Plaintiffs' relocation requests (and even chastised Plaintiffs for making such requests), knowing that Plaintiffs' dealership would fail without relocation. Defendant GM's failure and refusal to approve relocation not only was a bad faith act, but one which constructively then actually terminated Plaintiffs' franchise.

2. Defendants GM and GMF also took other wrongful actions to retaliate against Plaintiffs and to ensure that Plaintiffs' dealership failed. Defendant GM placed unreasonable sales quotas and working capital requirements Plaintiffs while depriving it of inventory. Defendant GMF placed unreasonable floor plan financing requirements on Plaintiffs, demanded unreasonable curtailments from Plaintiffs, and diverted payments from GM for new vehicle holdbacks and warranty reimbursement from Plaintiffs to GMF. Upon information and belief, Defendants GM and GMF acted in concert to destroy Plaintiffs' business and engineer its termination as a franchise dealership so that, upon information and belief, the site could be transferred to another operator for their benefit.

3. Plaintiffs seek to recover $20 million of compensatory damages on its legal claims for violation of the Federal and State Acts, fraud, fraudulent inducement, breach of contract, breach of the duty of good faith and fair dealing, retaliation, civil conspiracy, and racial discrimination in violation of § 42 U.S.C. 1981. Plaintiffs' damages consist of the millions of dollars invested and lost in Borderland's dealership, lost revenues and profits, lost "blue sky" (or goodwill) in the value of their business, lost income, debts incurred to keep the dealership running, pain, suffering and reputational damage, as well as all attorneys' fees, costs, expert fees according to statute. In

addition, the individual plaintiffs' careers have been destroyed and their finances devastated. Plaintiffs also seek an award of punitive damages to the maximum extent permitted by law.

## JURISDICTION AND VENUE

4. This Court holds jurisdiction over this action under 28 U.S.C §§ 1331 and 1332, as it asserts a cause of action arising under the laws of the United States and because it involves parties of diverse citizenship and the amount in controversy exceeds $75,000.

5. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(a), (b)(2) and 15 U.S.C. § 1222, because Plaintiff's place of business is located in this District, Plaintiff is a resident in this District, the parties are subject to the jurisdiction of this State, Defendant is found or has an agent in this District, and a substantial part of the events or omissions giving rise to the claims occurred here.

6. This Court holds supplemental jurisdiction, under 28 U.S.C. § 1367, over the pendent state law claims asserted herein.

## PARTIES

7. Plaintiff Be Strong LLC d/b/a Borderland Chevrolet GMC ("Borderland") is an Arizona limited liability company with a principal place of business in Douglas, Arizona. Until wrongfully forced to fail, Plaintiff Borderland owned and operated a franchised automobile dealership of Defendants in Douglas, Arizona. Plaintiff Borderland was engaged in the business of selling and servicing Chevrolet and GMC brand motor vehicles and parts.

8. Plaintiff Basement LLC is an Arizona limited liability company with a principal place of business in Douglas, Arizona. Plaintiff Basement LLC owns 100% of Plaintiff Be Strong LLC.

9. Plaintiff Mark Mermis is an individual domiciled in Arizona. Mr. Mermis is an

owner, officer and managing member of Borderland and Basement LLC. He is also a member of a racially protected minority class under 42 U.S.C. § 1981.

10. Plaintiff Kevin Walters is an individual domiciled in Arizona. Mr. Walters is an owner, officer and managing member of Borderland and Basement LLC.

11. Defendant General Motors LLC ("GM") is a Delaware limited liability company with a principal place of business in Flint, Michigan. Defendant GM is an automaker engaged in manufacturing, distributing, and selling motor vehicles and parts, including Chevrolet and GMC brand motor vehicles and parts.

12. Defendant AmeriCredit Financial Services Inc. d/b/a GM Financial ("GMF") is a Delaware limited liability company with a principal place of business in Fort Worth, Texas. Defendant GMF is a wholly owned subsidiary of Defendant GM and is its captive lender for GM for consumer automobile loans and leases. Defendant GMF is under the control of Defendant GM.

## FEDERAL AND STATE PROTECTIONS FOR AUTOMOBILE DEALERS

13. Federal and state laws protect automobile dealers and the public from unlawful and unfair business practices by powerful manufacturers and franchisors.

14. Congress and the U.S. Supreme Court have recognized the importance and validity of remedial automotive dealership and franchise statutes, explaining:

> Dealers are with few exceptions completely dependent on the manufacturer for their supply of cars. When the dealer has invested to the extent required to secure a franchise, he becomes in a real sense that economic captive of his manufacturer. The substantial investment of his own personal funds by the dealer in the business, the inability to convert easily the facility to other uses, the dependence upon a single manufacturer for supply of automobiles, and the difficulty in obtaining a franchise from another manufacturer all contribute toward making the dealer an easy prey for domination by the factory. On the other hand, from the standpoint of the automobile manufacturer, any single dealer is expendable. The faults of the factory-dealer system are directly attributable to the superior market position of the manufacturer.

*New Motor Vehicle Bd. v. Orrin W. Fox Co.*, 439 U.S. 96, 100 n. 4 (1978) (quoting S. Rep. No. 2073, 84th Cong., 2d Sess., 2 (1956)) (other citations omitted).

15. The Federal Act and the State Act are designed to protect dealers and consumers from powerful automobile manufacturers. They require manufacturers to deal with dealers in good faith, fairly, reasonably, and equitably, and provide for damages and the costs of recovery for any violation.

16. The Federal Act authorizes suit against manufacturers for damages sustained and the cost of suit for a manufacturer's failure "to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling or not renewing the franchise with said dealer." 15 U.S.C. § 1222 (2024). The Federal Act further defines "good faith" as acting "in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party." 15 U.S.C. § 1221 (e) (2024).

17. These duties of good faith run not just to the direct manufacturer of automobiles but also to "any person, partnership, or corporation which acts for and is under the control of such manufacturer or assembler in connection with the distribution of said automotive vehicles." 15 U.S.C. § 1221 (a) (2024). And a dealer can also sue these parties for violation of these duties under Federal Act. 15 U.S.C. § 1222 (2024).

18. The State Act prohibits a manufacturer from termination a franchise without good cause. A.R.S. § 28-4452(A). A manufacturer's wrongful termination under the State Act can be actual or constructive.

19. The State Act also prohibits a variety of "coercive" acts by a manufacturer against a dealer that deprives the dealer of the same rights as other dealers or coerces the dealer into entering into a franchise agreement and making improvements to facilities. A.R.S. § 28-4458.

20. The Federal Act and State Act are incorporated into the contractual agreements between manufacturers and dealers.

21. Plaintiff Borderland was an "automobile dealer" within the meaning of Section 1221(c) of the Federal Act.

22. Defendant GM is an "automobile manufacturer" within the meaning of Section 1221(a) of the Federal Act.

23. Defendant GMF is a "person, partnership, or corporation which acts for and is under the control of such manufacturer [GM] or assembler in connection with the distribution of said automotive vehicles," within the meaning of Section 1221(a) of the Federal Act.

24. The agreements between Plaintiff and Defendant constitute a "franchise" within the meaning of Section 1221(b) of the Federal Act.

25. Plaintiff Borderland is a "franchisee" within the meaning of A.R.S. § 28-4301 sub. 12 of the State Act.

26. Defendant GM is a "franchisor" within the meaning of A.R.S. § 28-4301 sub. 13 of the State Act.

27. Section 28-4307 of the State Act provides for a private right of action for its violation as follows:

> A dealer who suffers a pecuniary loss or who is otherwise adversely affected because of a violation of this chapter by a manufacturer or distributor has a cause of action against the manufacturer or distributor for damages and may recover those damages in any court of competent jurisdiction.

28. Plaintiffs therefore merit and invoke their rights and protections under the Federal

Act, the State Act, and common law, including, *inter alia,* the covenant of good faith and fair dealing which is implied in its agreements with Defendants. Moreover, these statutory provisions are explicitly and/or implicitly incorporated into all contractual obligations between the parties.

## DEFENDANT'S FRAUDULENT, VIOLATIVE AND OTHER WRONGFUL ACTS DESTROYED PLAINTIFFS' DEALERSHIP

### A. Background

29. Defendant GM is an automobile manufacturer headquartered in Michigan, with dealerships located throughout the nation. GM sells automobiles and parts and other products under the various brand names.

30. Defendant GMF is a wholly owned subsidiary and finance company which provides floor plan financing to the operators of GM's dealerships. Dealerships use floor plan financing to purchase vehicles from the manufacturer until they are sold to customers, and the short-term floor plan financing is paid off by the dealer when the vehicle is sold.

31. For many years, Borderland Chevrolet GMC was a GM franchise dealership in Douglas, Arizona that was operated under prior ownership until purchased in Plaintiffs. It had the right to sell both Chevrolet and GMC brand vehicles.

32. Before events giving rise to this dispute, Plaintiffs Mark Mermis and Kevin Walters, were both experienced businessmen with good reputations in the automotive industry.

33. Mr. Mermis, a veteran who served for over a decade in the United States' Army, has had a career of more than 30 years in the automotive industry. He worked as a sales attendant at Ford Motor Company and served for decades as the General Manager of large automobile sales chains. Through a family member who had Down syndrome, he became an advocate for the Special Olympics, and has been active in various charitable, public service and mentoring organizations.

34. Likewise, Mr. Walters has had a career of over 20 years in the automotive industry. He has worked at various automobile dealerships and developed a strong reputation in the industry.

35. In the Summer of 2023, both Mr. Mermis and Mr. Walters decided to partner together in purchasing their own automobile franchise dealership. For such purpose, they formed Basement LLC to serve as a holding company for Be Strong LLC, which owned the dealership's stock and assets.

36. Together, Plaintiffs entered into negotiation for the purchase of the assets of the existing Borderland Chevrolet GMC dealership in Douglas, Arizona, which was for sale by its owner. The Borderland Chevrolet GMC dealership was a franchise dealership of GM which had the right to sell both Chevrolet and GMC lines of vehicles.

37. In May 2023, Plaintiffs reached an agreement with the prior owner of the Borderland Chevrolet GMC Dealership to purchase the assets, including the real property, equipment and inventory and goodwill, for a total of $1,100,000.

38. This purchase was contingent upon Plaintiffs' successful approval by Defendant GM and GMF after completion of its application process to take over ownership, obtain the necessary financing and continue to operate as Borderland Chevrolet GMC as an authorized dealership.

39. Plaintiffs thereafter began the application process with Defendants over their approval as owners and operators of Borderland Chevrolet GMC as an authorized dealership, which lasted several months.

**B. Defendants' Fraudulent Inducement of Plaintiffs' Dealership Purchase**

40. During application process for Defendants' approval, Plaintiffs had numerous

discussions with GM officers and employees including Scott Roberts who was GM's Zone Manager. Mr. Roberts advised and coached Plaintiffs on navigating Defendant GM's application process and qualifying to become a franchise dealership.

41. Before completing the process to become a franchiser operator, Plaintiffs had specific discussions with Mr. Roberts about relocating the dealership to a more productive site. The dealership faced serious hurdles due to its location in Douglas, Arizona as the result of demographics, low economic output and the remote location.

42. Plaintiffs' ability to relocate the dealership was highly material to their completion of their purchase of Borderland Chevrolet GMC, and their proceeding with the GM-approval process. As a result, Plaintiffs sought assurance several times from Mr. Roberts and GM that they would be able to relocate the dealership after their purchase.

43. In fact, at one point, Plaintiffs reconsidered purchasing the dealership and were convinced otherwise by Mr. Roberts.

44. During discussions, Mr. Roberts and GM provided Plaintiffs with repeated assurances that they would be able to relocate the dealership to a more economically viable site after the purchase. He represented that GM had a "simple" process for the approval of the relocation of a dealership that he described as "routine" and stated would present "no problem" for Plaintiffs. He represented that relocation approvals were not unusual and approved in the ordinary course of business.

45. During the application process, Plaintiffs discussed with Mr. Roberts relocating the dealership to a specific property site in Benson, Arizona, which was a far more prosperous and potentially profitable location. Mr. Roberts agreed that property site was a very good location for a dealership, that Benson was an economically growing area, and that approval for a

relocation there would likely be granted. He represented that Plaintiffs should first complete the application process for the Douglas dealership, then submit an application for relocation to this site in Benson, Arizona. He represented to them that completing the purchase of the dealership in Douglas, and then relocating it, would be far easier and less expensive than purchasing a dealership elsewhere.

46. Mr. Roberts represented to Plaintiffs that he would strongly support and assist them in submitting their relocation request, and that he expected they would receive quick approval. He represented that GM wanted all of its dealerships to succeed, so he expected that Plaintiffs would easily be approved. He represented that he was very influential in the relocation process and that he would do everything that he could to ensure it would happen.

47. Plaintiffs justifiably and detrimentally relied on these representations and assurances by Defendant GM, through Mr. Roberts, when it completed the application process and purchase of the existing Borderland Chevrolet GMC dealership. Plaintiffs would not have completed the $1,100,000, nor made other investments including the purchase of property for the new site in Benson, Arizona, had his representations not been made.

48. Defendant GM and Mr. Roberts further knew or should have known that Plaintiffs' relocation of the dealership it was purchasing was necessary for its survival. At the time, Defendant GM and Mr. Roberts possessed knowledge that Plaintiff did not why relocation of the dealership out of Douglas, Arizona was even more critical to its success or failure.

49. Since approximately 2012, GM has known that a dealership in Douglas, Arizona has struggled to remain in business, that sales were declining, and that the prior operator tried unsuccessfully to sell the dealership many times. Plaintiffs were unaware how long the prior owner had tried unsuccessfully to sell the business or how badly it had struggled in the past.

50. Additionally, to secure conditional approval, Mr. Roberts reviewed in advance and assisted Plaintiffs on strategically presenting their application to Defendants. He advised them to not to include their property on the application balance sheet but only "assets, goodwill and blue sky," or he stated that they would not be approved. He further knew about various changes made due to concerns by Defendants.

51. Mr. Roberts knew that Plaintiffs' loan for the purchase price was denied more than once. He advised Plaintiffs to just work out a "prom note" with the prior owner-seller of the dealership, which was done. It was not until September 2024, or seven months after the purchase, that Plaintiffs reached an agreement with the seller. Typically, GM will refuse to approve a new dealer without assurance that it has the working capital and financial wherewithal to support the business operations of a dealership.

52. Mr. Roberts further assisted and worked with Plaintiffs to get financing and bond. He knew that Mr. Mermis had to invest $500,000 in physical improvements at the dealership in order to meet demands of lenders, which diverted working capital. He knew that Plaintiffs made substantial investments to purchase the dealership on expectation that it could be relocated to a more viable site.

53. In February 2024, at the last minute in the approval process, Defendants approved only Mr. Mermis as the sole "operator." Mr. Roberts represented that GM was approving only Mr. Mermis as the sole operator so that it could be a "100% minority-owned" dealership. Mr. Mermis is of Latin American heritage.

54. Upon information and belief, Mr. Roberts received awards, benefits and/or compensation from Defendant GM as the result of opening a new "100% minority-owned" dealership.

55. Upon information and belief, Defendant GM and Mr. Roberts were highly motivated to change the operator of the Borderland Chevrolet GMC dealership in Douglas, Arizona. The dealership had not been successful for many years, and GM and Mr. Roberts wanted a new operator and new investment in the physical facilities at the location. The fact the new operator was a "minority-owner" was a bonus.

56. As a result, through Mr. Roberts, GM made false and misleading representations to Plaintiffs about the relocation process and likelihood that the dealership would be approved for relocation to the site in Benson, Arizona. Mr. Roberts also knowingly evaded or sought to evade GM policies, standards and/or criteria for approval of new operators of dealerships so that it could approve a new minority operator, Mr. Mermis, at the Douglas location.

57. At various times, Mr. Roberts further represented to Plaintiffs that he would do everything he could, and that GM would provide all the support and assistance that it could to help Plaintiffs' dealership succeed. However, he knew that Plaintiffs completed their application, purchase of the dealership and investment in the dealership on the premise, based on his representations, that GMs' approval of the dealership's location to a more viable site was certain. He never truthfully or accurately disclosed the risk that this would not happen.

58. In short, based on the representations made, and the manipulation of the application process by Defendant GM and Mr. Roberts to approve a "minority-owned: dealership, Plaintiffs were exploited and "set up" for business failure by Defendant GM at the Douglas, Arizona location at the resultant cost of their respective careers, investments in the business, net worths and reputations.

### C. Bad Faith Failures to Approve Plaintiffs' Relocation Requests

59. After closing on the acquisition of the dealership, and receiving Mr. Mermis's

approval as operator, Plaintiffs proceeded to operate their new dealership in Douglas, Arizona, as well as to pursue plans for relocating the dealership to the chosen site in Benson, Arizona.

60. In expectation that Defendant GM would approve the relocation, Plaintiffs acquired the parcel of property at the location discussed with Mr. Roberts, and submitted a formal relocation request to GM.

61. Plaintiffs' relocation request included demographic and economic information about Benson, Arizona, as well as a letter in support from the Southeast Arizona Economic Development Corporation.

62. To Plaintiffs, the dealership's relocation of the dealership to Benson, Arizona offered advantages of higher median income among residents, lower poverty levels, higher property values, higher potential economic growth and potential from new residential developments.

63. Without relocation, Plaintiff believed that it could not survive long-term at its current site in Douglas, as it was a difficult environment for selling automobiles. Douglas is an economically poor area near the border of Mexico where approximately 70% of the local population is on welfare or other government support.

64. Plaintiffs realized that meeting the minimum sales requirements[2] imposed by Defendants were near-impossible at this site, and that selling less vehicles meant less allocation of vehicles to sell, which would lead to a downward spiral.

---

[2] Defendants evaluate their franchise dealers' sales performance using a metric called "Retail Sales Index" ("RSI"), a calculation based a comparison of actual vehicle registrations and average market share to determine expected market share for a locality. If a dealer achieves an RSI of 100%, it is considered "sales effective" while anything less is considered underperforming. Because it is an average, RSI fails to account for material variances across regions in demographic, economic and competitive factors which are out of the dealer's control. For this reason, RSI is a materially flawed measure that the New York Court of Appeals struck down as violating law when used as a measure of a dealer's sales performance. *See Beck Chevrolet*

65. Plaintiffs' request for relocation was denied by Defendants for reasons that were unfair, inequitable, unjustified, in breach of promises and representations made to Plaintiffs, and in bad faith.

66. The official reasons stated were that Defendant GM believed that its current location offered a better opportunity, and Benson, Arizona currently received adequate service by existing dealers in Silver City, Arizona, that were over 150 miles and two hours and forty minutes away under normal traffic.

67. Plaintiffs later learned that, between their purchase and GM's denial, that a dealership in Sierra Vista, Arizona was made an offer to purchase by the Ed Morse Automotive Group, a large chain which owned a dozen or more dealerships.

68. Upon information and belief, Defendants denied Plaintiffs' relocation request in the hope that the Ed Morse Automotive Group might seek to acquire Borderland in Douglas, Arizona.

69. Upon denial of a relocation to Benson, Arizona, Plaintiffs submitted a second request to Defendants to relocate to Silver City, New Mexico. Plaintiffs again spoke to Mr. Roberts about relocation to this site and he again was very positive about the prospects of Defendants' approval because it was such a good location. He mentioned during these discussions that the Ed Morse Group might want to buy the Douglas location.

70. Plaintiffs found a vacant store in Silver City that had previously been a Ford dealership so it would not need much work on physical improvements and submitted a request for relocation to this site in Silver City.

---

*Co., Inc. v. General Motors LLC*, 27 N.Y.3d 379, 391 (2016). Defendants wrongfully rely upon it when evaluating the performance of dealers, and their eligibility for vehicles, sales bonuses and awards programs.

71. After this relocation application was submitted, Mr. Roberts transferred from Plaintiff's area to another territory where he was no longer their local manager. He was replaced by local manager, Michal Monismith.

72. Plaintiffs believed that Silver City, New Mexico was prospectively a far more prosperous location than Duglas, Arizona, because it is growing city, with a local university and copper mines owned by Freeport, one of the largest mining companies in the world. Mr. Mermis had previously operated both Toyota and Ford dealerships in Silver City, where he knew how to succeed in the automobile sales business and was well-known and highly respected in the local community.

73. Defendant again denied Plaintiffs' relocation request for reasons that were unfair, inequitable, unjustified, in breach of promises and representations made to Plaintiffs, and in bad faith.

74. When confronted about the denial, Defendant GM's Regional Manager Paul Beckett got very angry with Mr. Mermis and said "No ! End of Conversation. Don't Ask Again."

75. At or about the time of the denial, Mr. Roberts advised Plaintiffs to reach out to Ed Morse about selling the dealership or property while it still had value. Upon information and belief, Mr. Roberts knew that Defendants' failure to approval a relocation would result in the failure of Plaintiffs' business.

76. In short, Defendants denied Plaintiffs' two requests for relocation for reasons that are unfair, inequitable, unjustified, in breach of promises and representations made to Plaintiffs, and in bad faith. Upon information and belief, Defendants denied the relocation requests was

motivated by their desire to maintain a minority-owned dealership approved for Douglas, Arizona.

**D. Conspiracy and Coordination to Force Dealership's Termination**

77. Upon the second relocation request denial, Defendants' relationship with Plaintiffs deteriorated and Defendants have conspired and coordinated efforts to cause Plaintiffs' dealership to fail so that it can terminate its franchise.

78. Defendant GM has sought to cause Plaintiffs' dealership to fail by unfairly, inequitably, discriminatorily and wrongly depriving it of vehicle allocations and inventory to sell. At first, the sales volume of the dealership fell from over 300 cars to below 100 cars, then the allocations dried up even further.

79. Due to Defendant GM's failure to allocate vehicles to it fairly, equitably and indiscriminately, Plaintiffs cannot generate vehicle sales sufficient to meet its RSI, maintain its working capital requirements or meet other demands placed on it by Defendants.

80. To squeeze Plaintiffs further, Defendants increased working capital demands and requirements. At times, Defendant GMF and GM have imposed inconsistent working capital demands and changed levels inconsistently.

81. In January 2026, Defendant GMF placed Plaintiffs under an ongoing audit review, froze all of its new car floorplan financing, and reduced its used-car floorplan financing by half. This reduction in financing prevents and limits Plaintiffs' ability to purchase vehicles to sell, which unfairly restricts Plaintiffs' ability to conduct business.

82. In response, Plaintiffs have sought alterative floorplan financing but Defendants have refused to approve and/or imposed conditions preventing Plaintiffs from receiving and

utilizing any alternative floorplan. Defendants have wrongfully interfered and prevented Plaintiffs from establishing alternative floorplan so that they could continue in business.

83. In addition, Defendant GMF has imposed unusual and extraordinary conditions that damage on Plaintiffs which damage its ability to conduct business and consummate sales. Defendant GMF has prevented Plaintiffs from delivering vehicles to customers until the floorplan loan on the vehicle is paid in full, which is not normal practice or procedure. Until a customer receives final approval from their lender for financing, there may be a four-to-five delay after a contract is signed, during which time Plaintiffs now cannot deliver the vehicle to the customer who purchased it (contrary to normal practice). This delay resulting from Defendant GMF's deviation from customary practice has effectively caused Plaintiffs to lose 15-to-20 sales of vehicles per month.

84. Defendants have also coordinated to impose unfair and unreasonable curtailments on Plaintiff's floorplan inventory, while routing Plaintiffs' open account payments from Defendant GM, over to Defendant GMF to cover the payments. Plaintiffs' open account payments include payments from Defendant GM to Plaintiffs for new vehicle holdbacks and warranty work performed, which are completed unrelated Plaintiffs' floorplan or inventory. These diversions damage Plaintiffs by unfairly depriving it of cash flow and working capital necessary to conduct business.

85. For instance, due to unreasonable curtailments and diversions of cash, Plaintiffs paid $90,000 more to Defendants on the floorplan of a Lexus car than they paid for its purchase at auction. Upon information and belief, Defendants unfairly imposed these charges to attempt to drive Plaintiffs out of business.

86. Over months, Defendants' coordinated efforts have strangled and hindered Plaintiffs' ability to sell vehicles and conduct business effectively and constructively terminated its franchise dealership before they actually terminated the franchise.

87. In August 2026, Defendants delivered notice of termination of Plaintiffs' franchise for reasons all caused by their own wrongful, illegal, unfair and discriminatory acts.

**E. Plaintiffs' Substantial Damages**

88. In sum, Defendants' unfair, unreasonable, illegal, discriminatory, and/or inequitable acts and omissions toward Plaintiffs as described above have caused them substantial personal and financial harm and damage.

89. Plaintiffs' dealership has failed as a business and was terminated as the result of Defendants' wrongful acts and omissions.

90. Plaintiffs have suffered from lost sales revenues and profits; loss of their investment in the dealership; loss of investment in alternative sites for the dealership; loss of investment in the physical facilities of the dealership; loss of good will and blue-sky value; unnecessary debt incurred; and increased and unnecessary accounting and legal cost and expense.

91. The individual Plaintiffs have also suffered harm and damage to their reputations and careers, along with pain, suffering, embarrassment and emotional distress.

92. Defendants' conduct was further so fraudulent, outrageous, intentional, reckless, grossly negligent and/or malicious that punitive damages to the maximum extent permitted by law should be awarded.

## LEGAL CLAIMS ASSERTED

### FIRST CAUSE OF ACTION
(Violations of the Federal Automobile Dealers Day in Court Act)

93. Plaintiffs repeat, reallege and incorporate by reference the above allegations.

94. The Automobile Dealer Day in Court Act (the "Federal Act"), codified as 15 U.S.C. §§ 1221-26, provides a vehicle dealer and franchisee with a federal cause of action against an automobile manufacturer who has failed to act in good faith.

95. Section 1222 of the Federal Act authorizes suit against a manufacturer, for damages and cost of suit, for the manufacturer's failure "to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling, or not renewing the franchise of said dealer."

96. Defendant failed to act in good faith or equitably, and acted coercively, in violation of the Federal Act, in its unfair, unreasonable, discriminatory, arbitrary, inequitable, and wrongful actions towards Plaintiffs which violated provisions of its dealer agreement and its own internal policies.

97. Defendant's violations, failures, breaches and wrongful actions in violation of the Federal Act include its false and misleading representations which induced Plaintiff into its franchise agreement, its failure to approve Plaintiffs' relocation requests, its failure to adhere to uniform standards in its application process, its failure to fairly, equitably, and non-discriminatorily allocate vehicles, its imposition of increased and/or inconsistent working capital requirements, its audit, its curtailments, its diversion of funds from open payments account and/or its interference and/or failure to approve alternative floorplan financing.

98. Defendant's violations, failures, breaches and wrongful actions in violation of the Federal Act constructively terminated, then effectively cancelled and terminated Plaintiffs' franchise without good cause.

99. As a result, Defendants directly and proximately caused Plaintiffs to suffer irreparable harm and substantial financial damage.

100. Defendants' bad faith, coercive, and wrongful acts, as set forth above, violate the Federal Act.

101. As a result, Defendants directly and proximately caused Plaintiffs to suffer damages, in an amount to be determined at trial, but in no event less than $20,000,000 in compensatory damages and punitive damages in an amount to be determined at trial and to the extent permitted by law.

102. In addition, Section 1222 of the Federal Act provides Plaintiff with the right to an award of attorneys' fees, costs, and disbursements in connection with its enforcement of its rights. Plaintiff has incurred, and will continue to incur, attorneys' fees, costs, and disbursements in connection with its enforcement of its rights, and merits an award of attorneys' fees, costs, and disbursements, in an amount to be determined at trial.

## **SECOND CAUSE OF ACTION**

(Violation of § 28-4452(A) and § 28-4458 of the Arizona Franchised Motor Vehicle Dealer Act)

103. Plaintiffs repeat, reallege and incorporate by reference the above allegations.

104. Section § 28-4452(A) of the Arizona Franchised Motor Vehicle Dealer Act (the "State Act") prohibits an automobile manufacturer (and its agents) from termination a franchise without good cause. A.R.S. § 28-4452(A). A manufacturer's wrongful termination under the State Act can be actual or constructive.

105. Section 28-4458 of the State Act prohibits automobile manufacturers (and its agents) from engaged in variety of "coercive" acts against a dealer that deprives the dealer of the same rights as other dealers or coerces the dealer into entering into a franchise agreement and making improvements to facilities. A.R.S. § 28-4458.

106. Defendant acted coercively, in violation of the State Act, in its unfair, unreasonable, discriminatory, arbitrary, inequitable, and wrongful actions towards Plaintiffs which induced it to enter into the franchise agreement, violated express and implied provisions of its dealer agreement and its own internal policies, and effectively cancelled and terminated Plaintiffs' franchise without good cause.

107. Defendant's coercive acts, violations, failures, breaches and wrongful actions in violation of the State Act include its false and misleading representations which induced Plaintiff into its franchise agreement, its failure to approve Plaintiffs' relocation requests, its failure to adhere to uniform standards in its application process, its failure to fairly, equitably, and non-discriminatorily allocate vehicles, its imposition of increased and/or inconsistent working capital requirements, its audit, its curtailments, its diversion of funds from open payments account and/or its interference and/or failure to approve alternative floorplan financing.

108. Defendant's coercive acts, violations, failures, breaches and wrongful actions in violation of the State Act constructively terminated, then effectively cancelled and terminated Plaintiffs' franchise without good cause.

109. As a result, Defendants directly and proximately caused Plaintiffs to suffer irreparable harm and substantial financial damage.

110. Defendants' bad faith, coercive, and wrongful acts, as set forth above, violate the State Act.

111. As a result, Defendants directly and proximately caused Plaintiffs to suffer damages, in an amount to be determined at trial, but in no event less than $20,000,000 in compensatory damages and punitive damages in an amount to be determined at trial and to the extent permitted by law.

**THIRD CAUSE OF ACTION**
(Fraudulent Inducement)

112. Plaintiffs repeat, reallege, and incorporate by reference the above allegations.

113. Defendants made false and misleading representations to Plaintiffs about its process for relocation, the prospects and likelihood that Plaintiffs' relocation request would be approved by Defendants, and that Defendants would provide support and assistance to ensure Plaintiffs' success as a dealership.

114. Defendants made such false and misleading representations to Plaintiffs to induce them to purchase the Borderland Chevrolet GMC dealership from its prior owner, to enter into a franchise agreement for the site in Douglas, Arizona, to invest in the physical facilities at the site, to operate a minority-owned dealership and/or to improve business at the dealership.

115. Plaintiffs justifiably relied on Defendants' false and misleading representations when it purchased the Borderland Chevrolet GMC dealership, applied for approval as operator, entered into a franchise agreement with Defendants, submitted relocation requests, invested in the dealership as well as alternative sites, and operated the dealership.

116. Defendants breached its representations to Plaintiffs by its failure to approve the relocation requests, its failure to provide support and assistance of Plaintiffs' dealership and efforts to relocate, its failure to fairly, equitably, and non-discriminatorily allocate vehicles, its imposition of increased and/or inconsistent working capital requirements, its audit, its curtailments, its diversion of funds from open payments account and/or its interference and/or its failure to approve alternative floorplan financing.

117. As a result, Defendants directly and proximately caused Plaintiffs to suffer irreparable harm and substantial financial damage.

118. As a result, Defendants directly and proximately caused Plaintiffs to suffer damages, in an amount to be determined at trial, but in no event less than $20,000,000 in compensatory damages and punitive damages in an amount to be determined at trial and to the extent permitted by law.

**FOURTH CAUSE OF ACTION**
(Fraud)

119. Plaintiffs repeat, reallege, and incorporate by reference the above allegations.

120. Defendants deceived Plaintiffs through false and misleading representations and material omissions about its process for relocation, the prospects and likelihood that Plaintiffs' relocation request would be approved by Defendants, and that Defendants would provide support and assistance to ensure Plaintiffs' success as a dealership.

121. Plaintiffs justifiably relied on Defendants' deception, false and misleading representations and material omissions when it purchased the Borderland Chevrolet GMC dealership, applied for approval as operator, entered into a franchise agreement with Defendants, submitted relocation requests, invested in the dealership as well as alternative sites, and operated the dealership.

122. Defendants' deception, false and misleading representations and material omissions to Plaintiffs are evidenced by its failure to approve the relocation requests, its failure to provide support and assistance of Plaintiffs' dealership and efforts to relocate, its failure to fairly, equitably, and non-discriminatorily allocate vehicles, its imposition of increased and/or inconsistent working capital requirements, its audit, its curtailments, its diversion of funds from open payments account and/or its interference and/or its failure to approve alternative floorplan financing.

123. As a result, Defendants directly and proximately caused Plaintiffs to suffer irreparable harm and substantial financial damage.

124. As a result, Defendants directly and proximately caused Plaintiffs to suffer damages, in an amount to be determined at trial, but in no event less than $20,000,000 in compensatory damages and punitive damages in an amount to be determined at trial and to the extent permitted by law.

**FIFTH CAUSE OF ACTION**
(Breach of Contract)

125. Plaintiffs repeat, reallege, and incorporate by reference the above allegations.

126. The Dealer Agreements and addenda between Plaintiff and Defendant are valid and enforceable contracts.

127. Plaintiff has materially performed under the agreements.

128. Section 4.4.2 of the 2025 Dealer Sales and Service Agreement ("2025 Dealer Agreement") between the parties requires Defendant to evaluate dealers' proposals for relocation "in light of network planning considerations."

129. Section 4.1 of the 2025 Dealer Agreement between the parties requires Defendant to locate dealerships properly to "permit each dealer the opportunity to achieve a reasonable return on investment."

130. Section 6.1 of the Dealer Agreement between the parties requires Defendant to distribute vehicles among dealers in a "fair and equitable manner."

131. Section 6.4.1 of the 2025 Dealer Agreement between the parties requires Defendant to supply Plaintiff with a "reasonable quantity and variety of current model Motor Vehicles in inventory."

132. Section 6.4.1 of the 2025 Dealer Agreement between the parties requires Defendant to "make available,… a mix of models and series of Motor Vehicles identified in the Motor Vehicle

Addendum in quantities adequate to enable Dealer to fulfill its obligation in its Area of Primary Responsibility."

133. The agreements between the parties also incorporate all of the relevant, applicable provisions of the Federal Act and State Act discussed herein.

134. Defendants' breaches of its contractual duties include, *inter alia*, its failure to approve Plaintiffs' relocation requests, its failure to provide support and assistance of Plaintiffs' dealership and efforts to relocate, its failure to fairly, equitably, and non-discriminatorily allocate vehicles, its imposition of increased and/or inconsistent working capital requirements, its audit, its curtailments, its diversion of funds from open payments account and/or its interference and/or its failure to approve alternative floorplan financing.

135. Defendant's breaches of its contractual duties constructively terminated, then effectively cancelled and terminated Plaintiffs' franchise without good cause.

136. As a result, Defendants directly and proximately caused Plaintiffs to suffer irreparable harm and substantial financial damage.

137. As a result, Defendants directly and proximately caused Plaintiffs to suffer damages, in an amount to be determined at trial, but in no event less than $20,000,000 in compensatory damages and punitive damages in an amount to be determined at trial and to the extent permitted by law.

## <u>SIXTH CAUSE OF ACTION</u>

(Breach of Implied Covenants of Good Faith and Fair Dealing)

138. Plaintiffs repeat, reallege, and incorporate by reference the above allegations.

139. Every contract contains an implied covenant of good faith and fair dealing.

140. The implied covenants include promises to act in good faith and deal fairly with each other; to act honestly; to act faithfully to the purposes of the contract and consistently with

parties' reasonable expectations; not to act arbitrarily or irrationally; and not to do anything that would have the effect of destroying or injuring the right of another party to receive the fruits of the agreement.

141. The implied covenants prohibit a party from acting in bad faith, dishonestly, or with improper motive to destroy or injure the other party's right to receive a contract's benefits.

142. This covenant applies even in instances where a party purportedly reserves the right to absolute discretion to act under the terms of the contract.

143. Defendants breached their duty of good faith and fair dealing to Plaintiffs in its unfair, unreasonable, discriminatory, arbitrary, inequitable, and wrongful actions towards Plaintiff which violated express and implied provisions of the parties' Dealer Agreement and GM's own internal policies.

144. Defendants' breaches of duties in violation of its duty of good faith and fair dealing include, *inter alia*, its failure to approve Plaintiffs' relocation requests, its failure to provide support and assistance of Plaintiffs' dealership and efforts to relocate, its failure to fairly, equitably, and non-discriminatorily allocate vehicles, its imposition of increased and/or inconsistent working capital requirements, its audit, its curtailments, its diversion of funds from open payments account and/or its interference and/or its failure to approve alternative floorplan financing.

145. Defendant's breaches of its duties of good faith and fair dealing constructively terminated, then effectively cancelled and terminated Plaintiffs' franchise without good cause.

146. As a result, Defendants directly and proximately caused Plaintiffs to suffer irreparable harm and substantial financial damage.

147. As a result, Defendants directly and proximately caused Plaintiffs to suffer damages, in an amount to be determined at trial, but in no event less than $20,000,000 in

compensatory damages and punitive damages in an amount to be determined at trial and to the extent permitted by law.

**SEVENTH CAUSE OF ACTION**
(Civil Conspiracy)

148. Plaintiffs repeat, reallege, and incorporate by reference the above allegations.

149. A civil conspiracy occurs where two or more persons agree to accomplish an unlawful purpose or to accomplish a lawful object by unlawful means, causing damages. *Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons Local No. 395 Pension Trust Fund*, 201 Ariz. 474 (2002). The legal claim for civil conspiracy lies where two or more parties conspire to destroy or injure another's business. *Savard v. Selby*, 508 P.2d 773, 776 (1973).

150. Defendants' violation of the Federal and State statutes, their fraud, fraudulent inducement, breaches of contract and other wrongful acts, individually and in concert, conspired to damage and destroy Plaintiffs' business. This included Defendants' deception, false and misleading representations and material omissions to Plaintiffs, its failure to approve the relocation requests, its failure to provide support and assistance of Plaintiffs' dealership and efforts to relocate, its failure to fairly, equitably, and non-discriminatorily allocate vehicles, its imposition of increased and/or inconsistent working capital requirements, its audit, its curtailments, its diversion of funds from open payments account and/or its interference and/or its failure to approve alternative floorplan financing.

151. Defendants' acts in civil conspiracy constructively terminated, then effectively cancelled and terminated Plaintiffs' franchise without good cause.

152. As a result, Defendants directly and proximately caused Plaintiffs to suffer irreparable harm and substantial financial damage.

153. As a result, Defendants directly and proximately caused Plaintiffs to suffer damages, in an amount to be determined at trial, but in no event less than $20,000,000 in compensatory damages and punitive damages in an amount to be determined at trial and to the extent permitted by law.

**EIGHTH CAUSE OF ACTION**
(Violation of 42 U.S.C. § 1981)

154. Plaintiffs repeat, reallege, and incorporate by reference the above allegations.

155. Section 1981 of the Civil Rights Law protects all persons from impairment by racial discrimination in the making, performance, modification, and termination of contracts, and guarantees all persons the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. 42 U.S.C. § 1981.

156. Defendants violated this statute by inducing Plaintiffs, through false and misleading representations and material omissions, to purchase the Borderland Chevrolet GMC dealership in Douglas, Arizona so that they could have a 100% minority-owned dealership at the location, and by failing to approve Plaintiffs' relocation requests so that they could have a 100% minority-owned dealership at the location.

157. Defendants also violated this statute by retaliating against Plaintiffs through coordinated efforts to damage its dealership including its failure to fairly, equitably, and non-discriminatorily allocate vehicles, its imposition of increased and/or inconsistent working capital requirements, its audit, its curtailments, its diversion of funds from open payments account and/or its interference and/or its failure to approve alternative floorplan financing.

158. Defendants' violations of this statute constructively terminated, then effectively cancelled and terminated Plaintiffs' franchise without good cause.

159. As a result, Defendants directly and proximately caused Plaintiffs to suffer irreparable harm and substantial financial damage.

160. As a result, Defendants directly and proximately caused Plaintiffs to suffer damages, in an amount to be determined at trial, but in no event less than $20,000,000 in compensatory damages and punitive damages in an amount to be determined at trial and to the extent permitted by law.

## Jury Demand

161. Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs demand judgment against Defendants, as follows:

a. awarding compensatory damages to the Plaintiffs jointly and severally against Defendants, in an amount to be determined at trial, but in no event less than $20,000,000;

b. awarding treble damages to the Plaintiffs, in an amount to be determined at trial;

c. awarding punitive damages to the Plaintiffs, in an amount to be determined at trial, to the maximum extent permitted by law;

d. awarding to the Plaintiffs attorney's fees, costs, and disbursements;

e. awarding to the Plaintiffs expert's fees, costs, and disbursements;

f. prejudgment interest;

g. post-judgment interest;

h. such other relief which the Court deems just and proper.

Dated: August 20, 2025
Mineola, New York

BELLAVIA COHEN, P.C.

By: ______________________________

Leonard A. Bellavia
(*pro hac vice pending*)
Edward H. Glenn Jr.
(*pro hac vice pending*)

200 Old Country Road, Suite 400
Mineola, NY 11501
(516) 873-3000

*Attorneys for Plaintiffs*